UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| GENIUS MEDIA GROUP INC., | Case No. 19 Civ. 7279 (MKB) (VMS) |
| *Plaintiff,* | |
| v. | |
| GOOGLE LLC and LYRICFIND, | |
| *Defendants.* | |

**PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF MOTION TO REMAND**

PRYOR CASHMAN LLP

Ilene S. Farkas
Marion R. Harris
Kaveri Arora
7 Times Square
New York, New York
(212) 421-4100
ifarkas@pryorcashman.com
mharris@pryorcashman.com
karora@pryorcashman.com

*Attorneys for Plaintiff*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ....................................................................... ii

PRELIMINARY STATEMENT ................................................................ 1

RELEVANT FACTS ................................................................................ 4

      A.    The Market for Music Lyrics Transcriptions ................................. 4

      B.    Genius's Service ............................................................................ 5

      C.    The Google Information Box ......................................................... 6

      D.    Genius Suspects Misappropriation ............................................... 7

      E.    Genius Catches Defendants "Red Handed" ................................... 8

      F.    Defendants Deflect Responsibility ............................................... 9

      G.    Defendants' Attempts to Conceal Their Wrongdoing ............................ 10

      H.    Defendants' Knowing and Deceptive Conduct Harms Genius and Consumers ................................................................................... 11

      I.    Lacking Any Other Recourse, Genius Sues Defendants ........................ 12

LEGAL STANDARD ............................................................................. 12

ARGUMENT .......................................................................................... 14

    I.    THE COPYRIGHT ACT DOES NOT PREEMPT GENIUS'S CONTRACT AND QUASI-CONTRACT CLAIMS ................................ 15

      A.    The Claims Arising Under Genius's Terms of Service Are Not Preempted By the Copyright Act ................................................. 15

      B.    Genius's Unjust Enrichment Claims Are Not Preempted By The Copyright Act ............................................................................... 18

    II.    THE COPYRIGHT ACT DOES NOT PREEMPT GENIUS'S UNFAIR COMPETITION CLAIMS .............................................................. 19

CONCLUSION ....................................................................................... 23

**TABLE OF AUTHORITIES**

**CASES**                                                                                      **PAGE(s)**

*Allstate Ins. Co. v. Credit Suisse Secs. (USA) LLC,*
    No. 11 Civ. 2232(NRB), 2011 WL 4965150 (S.D.N.Y. Oct. 19, 2011) .......................... 15, 17

*Architectonics, Inc. v. Control System, Inc.,*
    935 F. Supp. 425 (S.D.N.Y. 1996) .................................................................. 16

*Balram v. Cohen & Slamowitz,*
    No. 13-CV-07213(MKB), 2014 WL 527899 (E.D.N.Y. Feb. 7, 2014) .................................. 13

*BanxCorp. v. Costco Wholesale Corp.,*
    723 F. Supp. 2d 596 (S.D.N.Y. 2010) ............................................................... 16

*Big Vision Private Ltd. v. E.I. DuPont De Nemours & Co.,*
    1 F. Supp. 3d 224 (S.D.N.Y. 2014), *aff'd,* 610 F. App'x 69 (2d Cir. 2015).......................... 19

*Bill Diodato Photography, LLC v. Avon Products, Inc.,*
    No. 12 Civ. 847(RSW), 2012 WL 4335164 (S.D.N.Y. . Sept. 10, 2012)............................... 16

*CVD Equip.Corp. v. Precision Flow Tech., Inc.*
    No. 1:02-CV-651(NAM), 2007 WL 951567, at *2 (N.D.N.Y. Mar. 27, 2007) ...................... 18

*Canal Image UK v. Luvtak,*
    773 F. Supp. 2d 419 (S.D.N.Y. 2011)............................................................... 16

*Candelore v. Tinder, Inc.,*
    19 Cal. App. 5th 1138 (2018) .................................................................. 20, 21

*Computer Associates International, Inc. v. Altai, Inc.,*
    982 F.2d 693 (2d Cir. 1992)................................................................ 14, 15, 18

*eScholar, LLC v. Otis Educ. Sys.,*
    387 F. Supp. 2d 329 (S.D.N.Y. 2005)............................................................... 15

*Eyal R.D. Corp v. Jewelex New York Ltd.,*
    84 F. Supp. 2d 441 (S.D.N.Y. 2011)............................................................... 14

*Farneti v. BethPage FCU,*
    No. 13-CV-7218(SJF), 2014 WL 1797478 (E.D.N.Y. May 1, 2014) .......................... 13

*Gener–Villar v. Adcom Grp., Inc.,*
    417 F.3d 201, 203 (1st Cir. 2005)................................................................ 13

ii

**CASES**                                                                                          **PAGE(s)**

*International Security Exchange, LLC v. S & P Dow Jones Indices, LLC*,
   987 F. Supp. 2d 428 (S.D.N.Y. 2013)............................................................................ 14

*Jasper v. Bovina Music, Inc.*,
   314 F.3d 42 (2d Cir. 2002)...................................................................................... 12

*Kregos v. Associated Press*,
   3 F.3d 656 (2d. Cir. 1993)...................................................................................... 18

*Lennon v. Seaman*,
   63 F. Supp. 2d 428 (S.D.N.Y. 1999)...................................................................... 17

*Logicom Inclusive, Inc. v. W.P. Stewart & Co.*,
   No. 04 Civ. 0604 (CSH); 2004 WL 1781009 (S.D.N.Y. Aug. 10, 2004).............. 16

*Majd v. Bank of America, N.A.*,
   243 Cal. App. 4th 1293 (2016) .............................................................................. 20

*Mehlenbacher v. Akzo Nobel Salt., Inc.*,
   216 F.3d 291 (2d Cir. 2000).................................................................................... 13

*N.B.A. v. Motorola, Inc.*,
   105 F.3d 841 (2d Cir. 1997).................................................................................... 14

*National Car Rental System, Inc. v. Computer Associates International, Inc.*,
   991 F.2d 426 (8th Cir. 1993) ................................................................................. 17

*People v. Duzmor Diagnostic Laboratory, Inc.*,
   68 Cal. App. 4th 654 (1998) .................................................................................. 20

*People of New York ex rel. Cuomo v. First America Corp.*,
   No. 07 Civ. 10397(HP), 2008 WL 2676618 (S.D.N.Y. July 8, 2008).................... 13

*SCO Grp., Inc. v. IBM Corp.*,
   879 F.3d 1062 1080-81 (10th Cir. 2018) .............................................................. 20

*Shroeder v. Pinterest, Inc.*,
   133 A.D.3d 12 (1st Dep't 2015) ............................................................................ 19

*Silverstein v. Penguin Putnam, Inc.*,
   No. 01 Civ. 309(JFK), 2003 WL 1797848 (S.D.N.Y. Apr. 4, 2003)..................... 21

**CASES**                                                                                    **PAGE(s)**

*Sleppin v. Thinkscan.com, LLC,*
    55 F. Supp. 3d 366 (E.D.N.Y. 2014) ............................................................... 12, 13

*Stadt v. Fox News Network LLC,*
    719 F. Supp. 2d 312 (2010) ................................................................................ 16

*Taquino v. Teledyne Monarch Rubber,*
    893 F.2d 1488 (5th Cir. 1990) .......................................................................... 17

*Telecom Inter. Am. Ltd. v. AT&T Corp.,*
    280 F.3d 175 (2d Cir. 2001).............................................................................. 19

*Utopia Provider System, Inc. v. Pro–Med Clinical System, L.L.C.,*
    596 F.3d 1313 (11th Cir. 2010) ....................................................................... 16


**STATUTES**

17 U.S.C. § 301 ....................................................................................................... 14

**TREATISE**

1 *Nimmer on Copyright* § 1.01[B] .......................................................................... 14

Plaintiff Genius Media Group, Inc. ("Genius") respectfully submits this Memorandum of Law in Support of its Motion to Remand (the "Motion").

## PRELIMINARY STATEMENT

This is not a copyright action. Rather, it is an action by Genius against competitors who are misappropriating valuable lyrics transcriptions from Genius's website and using that misappropriated content to directly harm Genius's business, as well as competition in the market for lyrics data. These actions are in violation of Genius's Terms of Service, to which the defendants are bound, and constitute unfair competition under New York and California law.

While none of the parties to this action owns the copyrights in music lyrics, there is independent value in the accuracy and speed of Genius's music lyrics transcriptions. The Defendants themselves clearly recognize this value, as they entered into a commercial agreement for one of them—LyricFind—to provide its lyrics transcriptions for use in another's—Google's—service. In reality, many of those lyrics transcriptions were taken directly from Genius's website, as evidenced by the watermarks Genius embedded in lyrics appearing on its website. This is breach of contract and unfair competition, not copyright infringement.

The lyrics to songs are not typically published or made available online by the songwriters and music publishers that control the rights to those lyrics. Genius has created a business out of developing and maintaining a vast repository of annotated lyrics to fill this void. Specifically, Genius has cultivated a community of millions of music enthusiasts who transcribe music lyrics and upload them to Genius's website. Lyrics transcription is an arduous task that often requires genre experts to repeatedly listen to songs in order to produce accurate transcriptions. Lyrics transcription on Genius is also unique in that it is a collaborative activity, where multiple members of the Genius community often work together on a single lyrics transcription simultaneously, further bolstering the accuracy and the speed with which it is produced. Genius has invested <u>tens</u>

of millions of dollars to build the technology and community to create and foster this unique collaborative transcription process. The high quality and ready availability of lyrics on Genius is a direct result of this technology and Genius's loyal and engaged community of users.[1] Through its investment, Genius has gained a reputation as the foremost accurate source of music lyrics and has built its business—including selling advertising on its website and licensing content to partners—based on this reputation.

Google is the undisputed behemoth of internet search, and is the starting point for over 80% of U.S. internet search queries.  When Google went public in 2004, it included the following quote from its co-founder Larry Page in its public offering filings: "you come to Google to quickly find what you want.  Then we're happy to send you to the other sites. . . . "  Since 2004, something has changed.  In 2019, Google directed less than half of its search traffic to other sites, keeping the rest within the Google ecosystem. Google swallows so much of its own search traffic in large part due to a feature it calls "Information Boxes"—panels highlighting Google's own products that the company places in search results above links to organic search results.  For lyrics search queries, Google will often display lyrics transcriptions in an Information Box, which appears at the top of search results pages and requires users to affirmatively scroll past the Information Box to see organic search results (including non-Google related results), such as Genius's website.  According to Google, LyricFind licenses to Google many of the lyrics displayed in Google's lyrics Information Boxes.

For all parties to the action, having a high-quality catalog of lyrics transcriptions is critical to their business endeavors in the lyrics market.  Since transcriptions are not typically provided by music publishers and/or songwriters, all parties have two legitimate choices to develop that

---

[1] Genius has licensing arrangements with the relevant copyright holders for the lyrics it displays on its website.

catalog—(i) license it from someone else who has developed such a catalog through legitimate means; or (ii) create accurate and timely transcriptions of music lyrics themselves.

Google and LyricFind, however, have apparently sought a third option in developing their catalogs of lyrics transcriptions—misappropriating them from Genius's website (and concealing that misappropriation).  As alleged in the Complaint, this misappropriation is indisputable, because Genius embedded digital "watermarks" in a sample of lyrics displayed on its website. These watermarks—hard-to-detect patterns of special characters—permitted Genius to confirm with certainty that many lyrics displayed in Google's lyrics Information Boxes were misappropriated from Genius's website. This misappropriation was wholesale, deceptive, without authorization, anti-competitive, and in breach of Genius's Terms of Service.   When confronted privately by Genius with the uncontroverted proof of their actions, Defendants ignored the evidence and their unlawful behavior continued unabated.  And, when the two watermarks deployed by Genius were made public—in a Wall Street Journal Article and in this action's Complaint, respectively— Genius's watermarks disappeared from Google's lyrics Information Boxes, while the underlying, irrefutably misappropriated lyrics remained entirely unchanged. Google also pledged there would be an investigation, and declared "[w]e always strive to uphold high standards of conduct for ourselves and from the partners we work with."

Google's pledge to "investigate," their reference to "high standards of conduct," and the sudden removal of the watermarks after they became public demonstrates that Defendants knew that what they were doing was wrong.  But rather than admit their transgression, agree to cease their theft and compensate Genius, Defendants seek to avoid responsibility by attempting to mislead this Court with their unfounded "preemption" argument.  If they truly thought that there was nothing of value to Genius's work product, then why did they misappropriate it?

This Court should see this action for what it is—unfair competition in the market for the accurate and timely transcription of music lyrics and breach of contract for violation of Genius's Terms of Service—and remand the well-pleaded, state law claims back to the Supreme Court of the State of New York, County of Kings.

## RELEVANT FACTS

### A.  The Market for Music Lyrics Transcriptions

Music publishers and songwriters, who generally own the copyrights to lyrics, typically do not make these lyrics publicly available; indeed, they often do not even maintain a database of such lyrics.  Yet, there is a strong consumer demand for accurate lyrics, especially when new music is released.  (Compl. ¶ 18.)

Since its founding in 2009 as "Rap Exegesis," Genius has cultivated a vast community of music fans who enthusiastically transcribe and edit music lyrics on Genius's website—often within minutes of the release of new music.  Genius has also cultivated partnerships with songwriters and performers in order to create the most timely, comprehensive and accurate source for music lyrics. This community of Genius users and partners gives Genius a preeminent repository of accurate and timely lyrics transcriptions, which is essential in the market for music lyrics.  (*Id.* ¶ 20.) Genius's user-transcribers and all visitors to Genius's website generate critical advertising revenue for Genius. (*Id.* ¶¶ 16, 22.)  Moreover, Genius hires employees, known as "lyrics associates," whose entire job consists of transcribing lyrics.

LyricFind licenses lyric transcriptions to Google.  It describes itself as the "world's leader in lyric solutions" and purportedly maintains a "quality-controlled, vetted database of . . . lyrics available for licensing and service to over 200 countries."  (*Id.* ¶ 9.)  In or about 2016, LyricFind partnered with Google "to expand lyric offerings," with LyricFind's CEO noting that LyricFind

was "happy to expand the depth and quality of lyrics available on Google's services."[2]  LyricFind receives compensation from these "partnerships" in recognition of the "depth and quality" of the lyrics available in LyricFind's catalog of transcriptions.

When a licensee receives a license to display copyrighted lyrics from a music publisher, the publisher typically does not provide the actual lyrics to the licensee.  Licensees, including the parties to this action, must obtain the lyrics transcriptions through other means—by either (i) obtaining such transcriptions from a company that has transcribed or otherwise legally obtained them (as Google purportedly does from LyricFind); or (ii) transcribing the lyrics themselves (as LyricFind purportedly does and Genius, through its community of music enthusiasts, in fact does). (*Id.* ¶ 19.)  Genius and Google compete for users, or eyeballs, in the market for the provision of timely and accurate music lyrics to the consuming public on the internet, and the ability to show advertisements to those users. Genius and LyricFind compete in the licensing of accurate and timely music lyrics transcriptions.

### B.  Genius's Service

All users of Genius's website and apps ("Genius's Service") are bound by its Terms of Service, which limit access to personal use, prevent the copying or other misappropriation of content from Genius's Service, and restrict the "commercial use" of any content from Genius's Service.  (*Id.* ¶ 24.)  Because the timely and accurate transcription of music lyrics is an arduous process, Genius's Terms of Service were drafted to ensure that the benefits of such labor cannot simply be misappropriated by others for their own pecuniary gain—precisely what the Defendants have done here.

---

[2] *See* LyricFind Partners with Google to Delivery More Lyrics and Administer Rights, *accessible at* http://
https://www.lyricfind.com/index.php?id=224 (last accessed February 5, 2020).

A majority of Genius's web traffic originates from Google's search product.  (*Id.* ¶ 23)  A significant portion of Genius's revenue is generated by the monetization of this web traffic. Genius also earns revenue through the licensing of its catalog of music lyrics transcriptions. For example, Apple pays Genius to license Genius's lyrics transcriptions—often the very same lyrics transcriptions misappropriated by the Defendants—for display in its Apple Music product.  (*Id.* ¶ 22.)

### C.  **The Google Information Box**

Beginning around December 2014, Google implemented an "Information Box" in lyrics search result pages.  The lyrics Information Box appears above all other organic search results when a user queries the name of a song together with "lyrics". (*Id.* ¶ 29.)   Accordingly, virtually all mobile users and many desktop users are unable to see organic search results (which, in many cases, include Genius's website in the first position) without first scrolling down past the Information Box.  (*Id.* ¶ 30.)  Google often displays its Information Boxes along with links to other revenue-generating Google products, such as YouTube, all of which have the effect of steering Google Search users to Google-branded products which Google is then able to monetize, to the detriment of websites like Genius that appear in the organic search results.  (*Id.* ¶ 31.)

Google's prominent displays of its Information Box and other Google-branded products above organic lyrics search results directly contradicts its own search quality guidelines.  (*Id.* ¶ 31.) For example, Google's Search Quality Evaluator Guidelines (the "SQEG") indicate that Google prioritizes accurate search results that meet the search user's intent.  Those same Guidelines, however, instruct reviewers to rate Information Boxes—regardless of their accuracy, and without instructing its evaluators to make any inquiry into their accuracy—with the highest possible rating (*Id.* ¶ 38.)  In many cases, however, Google's Information Box often displays inferior and/or

inaccurate music lyrics.  (*See, e.g.*, *id*. ¶ 41.)  Elsewhere in its SQEG, Google makes clear that it

places little to no value on copied content:

> The Lowest rating is appropriate if all or almost all of the [Main Content] on the page is copied with little or no time, effort, expertise, manual curation, or added value for users.  Such pages should be rated Lowest, even if the page assigns credit for the content to another source.

(*Id.* ¶ 43.)  Accordingly, based on Google's own guidance to search evaluators, a reasonable person

would expect that Google's search engine would disfavor copied content obtained without

permission and consequently rank it lower on search engine results pages.  In reality, however,

Google's Information Box lyrics results are displayed above all other search results without regard

to their accuracy and without any evaluation of whether they are copied without permission from

another source, such as Genius's website.

### D.  Genius Suspects Misappropriation

On June 8, 2016, Genius observed that the lyrics Information Box for the Desiigner song

"Panda" were a character-for-character match to those appearing on Genius's service.  (*Id.* ¶¶ 49-

51).  At the time, Genius was only aware of two other companies engaged in licensing lyrics

transcriptions on the internet—Musixmatch and LyricFind, neither of whom appeared to have

provided the suspect lyrics to Google.[3]  Indeed, it appeared that only after Google and LyricFind

entered into their license—pursuant to which Google pays LyricFind millions of dollars per year

to provide accurate lyrics transcriptions—did the "Panda" lyrics in Google's lyrics Information

Box suddenly change to reflect inaccurate lyrics, presumably sourced from LyricFind.  (*Id.* ¶ 17,

n.5.)  Thus, the only logical conclusion was that Google itself misappropriated the lyrics from

---

[3] This determination was based on Genius's review of other sites displaying "Panda" lyrics that were known licensees of Musixmatch and LyricFind at that time (azlyrics.com and metrolyrics.com, respectively).  (*Id.* ¶¶ 55-57.)

Genius's service and, notwithstanding its SQEG concerning "copied" content, prominently displayed those lyrics in its Information Box.  (*Id.* ¶¶ 43, 58.)

### E.  Genius Catches Defendants "Red Handed"

Following Genius's observation of the apparent misappropriation of the "Panda" lyrics from its service, in or about August 2016, Genius deployed a watermark on certain new lyrics transcriptions on its service ("Watermark #1").  (*Id.* ¶ 59.)  Watermark #1 involved replacing apostrophes in a selection of newly-released songs with a distinctive pattern of curly and straight apostrophes, which when converted to dots and dashes respectively, spell "RED HANDED" in Morse code.  (*Id.* ¶ 60.)  Genius designed Watermark #1 such that if the apostrophe pattern were found outside of Genius's website, there would be no explanation other than that the lyrics were improperly copied from its website.  (*Id.*)  Over the next several months, Genius observed that various lyrics in Google's lyrics Information Boxes featured Watermark #1, confirming its earlier suspicions.  (*Id.* ¶ 61.)

In or about May 2017, Genius notified Google that Watermark #1 was appearing in Google's lyrics Information Boxes and provided an example of a song featuring Watermark #1. (*Id.* ¶ 62.)  Google repeatedly indicated that it was "looking into" the issue, but never provided a substantive response nor explained how the lyrics containing Watermark #1 appeared in Google's lyrics Information Boxes.  (*Id.* ¶ 63.)  In October 2018, Genius designed an experiment to more systematically assess the incidence of lyrics misappropriated from Genius's website in Google's lyrics Information Boxes and performed daily searches on Google to confirm whether the watermarked lyrics were being displayed in the lyrics Information Boxes.  (*Id.* ¶¶ 64-65.)  The results showed that between October 2018 and December 2018, over 40% of songs in the sample set for which Google provided a lyrics Information Box contained evidence of misappropriation from Genius's Service.  (*Id.* ¶ 66.)  This further confirmed the ongoing, systematic and widespread

misappropriation of content from Genius's Service, despite actual notice to Google of the issue. (*Id.* ¶ 67.)

### F.  Defendants Deflect Responsibility

In April 2019, Genius again wrote Google regarding its ongoing misappropriation of content from Genius's website and demanded that Google cease and desist from its wrongful and anticompetitive conduct.  (*Id.* ¶ 68.)  In response, Google assured Genius that the lyrics were "obtained through several licensors not through scraping"—failing to acknowledge that, whatever the source of the lyrics, they were watermarked and thus irrefutably copied from Genius's Service. After requesting 20 additional examples of lyrics in the Information Box containing Watermark #1 (which Genius provided), Google subsequently identified LyricFind as the source of the lyrics transcriptions.  (*Id.* ¶¶ 69-70.)

Genius next wrote to LyricFind, demanding it cease and desist from the misappropriation and commercialization of content from Genius's website, which is both anticompetitive and a violation of Genius's Terms of Service.  (*Id.* ¶ 71.)  Despite actual notice of the ongoing misappropriation of content from Genius's Service, neither Defendant took any steps to cease such conduct and continued to commercialize the misappropriated content bearing Watermark #1.  (*Id.* ¶¶ 72-73.)

On June 16, 2019, the *Wall Street Journal* published an article titled "Lyrics Site Accuses Google of Lifting Its Content," which outlined Defendants' misappropriation of the lyrics from Genius's website.  (*Id.* ¶ 74.)  Only after the publication of this article did the Defendants respond to the allegations.  In one such response, Google wrote:

> News reports this week suggested that one of our lyrics content providers is in a dispute with a lyrics site about where their written lyrics come from.  We've asked our lyrics partner to investigate the issue to ensure they're following industry best practices in their approach.  We always strive to uphold high standards of conduct for ourselves and from the partners we work with.

(*Id.* ¶ 77.)  Google's response clearly demonstrates that it understood that lyrics transcriptions are valuable assets and that the misappropriation of such transcriptions is wrong.

### G.   Defendants' Attempts to Conceal Their Wrongdoing

Shortly after the publication of the *Wall Street Journal* article, Watermark #1 disappeared from Google's lyrics Information Boxes, suggesting to Genius that a deliberate effort was being made to conceal the wrongdoing.  (*Id.* ¶¶ 82-83.)  To test this theory, Genius devised a second watermark ("Watermark #2"), which replaced select spaces in lyrics transcriptions with a special Unicode character (U+2005) called a "four-per-em space," which looks identical to a normal space character but can be distinctly identified by a computer.  (*Id.* ¶ 84.)  These characters were placed into song lyrics such that, if (ignoring the first 14 spaces of a song's lyrics) the four-per-em spaces were converted to dashes and regular spaces were converted dots, it would spell "GENIUS" in Morse code.  (*Id.*)

In addition to applying Watermark #1 (which was then-publicly known) and Watermark #2 to two distinct samples of song lyrics on Genius's website ("Group A" and "Group B", respectively), Genius watermarked a third group of lyrics with both Watermark #1 <u>and</u> Watermark #2 ("Group C").  (*Id.* ¶ 85.)  Genius regularly monitored the lyrics Information Boxes for all three groups.  Genius did not observe the now publicly-known Watermark #1 in any content in Google's lyrics Information Boxes.  Genius did, however, routinely observe the still-secret Watermark #2 in Google's Information Boxes in connection with the lyrics in Groups B and C. (*Id.* ¶ 86.)  In other words, across all three groups of watermarked lyrics transcriptions, the publicly-known Watermark #1 was removed after the content was misappropriated from Genius's Service and before it was placed into the lyrics Information Boxes, while the non-publicly known Watermark #2 remained.  This demonstrated that not only were Defendants aware of their wrongdoing (having

been previously put on actual notice of it), but they were now taking affirmative steps to conceal it. (*Id.* ¶¶ 87-89.)

Genius again wrote Google on November 6, 2019, notified Google of its observations and demanded that Google cease and desist from its wrongful conduct.  Google responded that it "had done nothing wrong" and continued to assign all blame to its lyrics licensing partners, including LyricFind.  (*Id.* ¶¶ 90-91.)

### H. Defendants' Knowing and Deceptive Conduct Harms Genius and Consumers

As a result of the Defendants' wrongful and deceptive misappropriation of valuable content from Genius's Service, combined with Google's lyrics Information Box placement above organic search results, Genius's click-through rate (the rate at which a Google search user clicks through to its website) dropped precipitously, directly affecting Genius's financial performance.  (*Id.* ¶¶ 100-103.)  Indeed, Defendants' misappropriation of the content from Genius's Service was used to stifle Genius's ability to monetize its services in the very markets in which each of the Defendants competes – *i.e.*, the timely and accurate provision of music lyrics to the consuming public (Genius and Google) and the licensing of these music lyrics transcripts to others (Genius and LyricFind).  (*Id.* ¶¶ 105-107.)  Defendants are able to reap rewards for outcompeting Genius by simply misappropriating the product of Genius's considerable efforts, without compensating Genius for the time, energy and effort it takes to transcribe music lyrics accurately and quickly. Indeed, Google is knowingly paying LyricFind for a license for lyrics transcriptions that LyricFind is willfully misappropriating from Genius, and then Google is attributing them to LyricFind. Defendants are freeriding on Genius's efforts to the direct detriment of Genius's business.  (*Id.*) Moreover, Google is able to direct users to other products in its own ecosystem for its own pecuniary gain, despite the content and placement of its Information Boxes being deceptive and anticompetitive (*Id.* ¶¶ 109-110.)  Finally, by misappropriating the fruits of Genius's substantial

11

labor and investment, Defendants deprive Genius of revenue and undermine Genius's ability to continue to produce the very lyrics transcriptions that Defendants continue to misappropriate and that consumers demand. The diversion of traffic and revenue from Genius directly harms consumers by impairing Genius's ability to produce the timely and accurate lyrics transcriptions that the market demands.

## I.   <u>Lacking Any Other Recourse, Genius Sues Defendants</u>

While Genius repeatedly attempted to engage with Defendants in good faith regarding their conduct, Defendants either denied wrongdoing or deflected blame, leaving Genius with no choice but to file suit for the past and ongoing damage to its business as a result of Defendants' improper and deceptive competitive practices.   Genius is a harmed competitor seeking redress for demonstrated, unequivocal anticompetitive conduct traceable to Defendants, which also constitutes a breach of Genius's Terms of Service.   Defendants' conduct violates the law of New York and California, as well as breach of the express terms of Genius's Terms of Service.

## LEGAL STANDARD

Defendants' sole basis for removing this action to federal court is the pretext that Genius is simply suing for infringement of the copyright in music lyrics and thus its claims are preempted by the Copyright Act.   However, that is a complete mischaracterization of Genius's claims.   In its Complaint, Genius asserted no copyrights over any of the content and labor misappropriated by the Defendants.[4]   Even if copyrights were implicated in Genius's complaint, however, the law in the Second Circuit is clear – "the mere fact that 'a case concerns a copyright does not necessarily mean that it is within the jurisdiction of a federal district court.'" *Sleppin v. Thinkscan.com, LLC*, 55 F. Supp. 3d 366, 372 (E.D.N.Y. 2014) (quoting *Jasper v. Bovina Music, Inc.,* 314 F.3d 42, 46

---

[4] Indeed, in the Complaint, Genius explicitly alleges that "music publishers and/or songwriters usually own the copyright in the lyrics for a given song…."  (Compl. ¶ 18)

(2d Cir. 2002)).  "Rather, the question of whether a state law claim arises under the Copyright Act 'poses among the knottiest procedural problems in copyright jurisprudence.'" *Sleppin,* 55 F. Supp. at 372 (quoting *Gener–Villar v. Adcom Grp., Inc.*, 417 F.3d 201, 203 (1st Cir. 2005)).  Defendants' conduct and the damages sought by Genius in this action fall well outside the preemptive ambit of the Copyright Act.  Indeed, Defendants know full well that Genius seeks redress for harm separate and apart from the Copyright Act – as these *Defendants have acknowledged in their own license agreement*, and the payments exchanged thereunder the valuable nature of that which Genius seeks to protect here.

The burden of demonstrating federal jurisdiction in a removed case is exacting on the removing defendants.  Defendants' already high burden is even more difficult to meet, as Defendants' sole basis of removal is copyright preemption.[5]  Proving the existence of federal jurisdiction falls squarely on the removing party – "it is the party seeking to sustain the removal and not the party seeking remand that bears the burden of demonstrating that removal was proper." *People of N.Y. ex rel. Cuomo v. First Am. Corp.*, No. 07 Civ. 10397 (LTS)(HP), 2008 WL 2676618 (S.D.N.Y. July 8, 2008) (citation omitted); *see also Farneti v. BethPage FCU*, No. 13-CV-7218(SJF), 2014 WL 1797478 (E.D.N.Y. May 1, 2014); *Mehlenbacher v. Akzo Nobel Salt., Inc.* 216 F.3d 291, 296 (2d Cir. 2000).  Federal courts must "construe the removal statute narrowly, resolving any doubts against removability, '[i]n light of the congressional intent to restrict federal court jurisdiction, as well as the importance of preserving the independence of state governments.'"  *Balram v. Cohen & Slamowitz*, No. 13-CV-07213(MKB), 2014 WL 527899, at 273 (E.D.N.Y. Feb. 7, 2014).  Moreover, on motion to remand, the court "must construe all

---

[5] Despite demonstrated unfair and deceptive conduct by Defendants, a decision finding Genius's claims preempted would be tantamount to *carte blanche* for Defendants to continue to engage in this palpably improper conduct, a result neither intended by Congress in § 301 of the Copyright Act nor appropriate under the circumstances here.

disputed questions of fact and controlling substantive law in favor of the plaintiff." *Allstate Ins. Co. v. Credit Suisse Secs. (USA) LLC,* No. 11 Civ. 2232(NRB), 2011 WL 4965150, at *3 (S.D.N.Y. Oct. 19, 2011) (citation omitted).

## ARGUMENT

Under Section 301 of the Copyright Act, 17 U.S.C. § 301, a state law claim will be preempted only when: "(i) the state law claim seeks to vindicate 'legal or equitable rights that are equivalent' to one of the bundle of exclusive rights" protected by the Copyright Act (the "General Scope Requirement") <u>and</u> where (ii) "the particular work to which the state law claim is being applied" falls under the type of work protected by the Copyright Act (the "Subject Matter Requirement"). *N.B.A. v. Motorola, Inc.*, 105 F.3d 841 (2d Cir. 1997). While federal preemption of the Copyright Act was once broadly applied, the Supreme Court and lower courts have since retreated from such a broad approach. *See Eyal R.D. Corp v. Jewelex N.Y. Ltd.*, 84 F. Supp. 2d 441 (S.D.N.Y. 2011).

Under the General Scope Requirement, it is well-settled that a state law claim will not be preempted by the Copyright Act if an "extra element" exists that changes the nature of the action so that it is qualitatively different from a copyright infringement claim. *See Computer Assocs. Int'l, Inc. v. Altai, Inc.,* 982 F.2d 693, 716 (2d Cir. 1992) ("if an 'extra element' is 'required instead of or in addition to the acts of reproduction, performance, distribution or display, in order to constitute a state-created cause of action, then the right does not lie within the general scope of copyright,' and there is no preemption'") (quoting 1 *Nimmer on Copyright* § 1.01[B], at 1-14-15). Under the Subject Matter Requirement, a state claim will not be preempted if the claim is premised on assets that are not protected by copyright. *See, e.g.*, *International Sec. Exch., LLC v. S & P Dow Jones Indices, LLC*, 987 F. Supp. 2d 428, 431 (S.D.N.Y. 2013).

"To determine whether a claim meets this [extra element] standard, [the Court] must determine 'what plaintiff seeks to protect, the theories in which the matter is thought to be protected and the rights sought to be enforced.'." *Computer Assocs.,* 982 F.2d at 716 (citation omitted). Here, as discussed *infra,* Genius's claims are qualitatively different from Copyright Act claims. The rights sought to be enforced are broader and different than the exclusive rights existing under the Copyright Act and concern the substantial investment of time and labor by Genius in a competitive market, which was knowingly misappropriated by its competitors (Defendants) to the direct financial detriment of Genius.

I.    **THE COPYRIGHT ACT DOES NOT PREEMPT GENIUS'S CONTRACT AND QUASI-CONTRACT CLAIMS**

Defendants are bound by Genius's Terms of Service, which impose on Defendants an obligation not to copy or scrape Genius's Service for "commercial purposes." Under the law of the Second Circuit, this independent, contractual obligation constitutes an "extra element" which makes the claim qualitatively different from a Copyright Act claim. Accordingly, Genius's contract claims (Counts I through IV) are not preempted. Additionally, Genius's quasi-contract claims (Counts IX and X), unjust enrichment, are likewise not preempted because Defendants' deceptive conduct as alleged in the complaint is qualitatively different from a Copyright Act claim.

A.    **The Claims Arising Under Genius's Terms of Service Are Not Preempted By the Copyright Act**

It is well settled that, as a general matter, breach of contract claims are not preempted by copyright law, as the promise inherent in a contract is a sufficient "extra element" to defeat preemption. In *Architectonics, Inc. v. Control Sys., Inc.*, 935 F. Supp. 425 (S.D.N.Y. 1996), the court observed, "[p]rotection from breach of contract . . . is not equivalent to copyright protection because a contract claim requires an 'extra element' that render the claim qualitative different from a claim for copyright infringement: a promise by defendant." *See also eScholar, LLC v. Otis Educ.*

15

*Sys.*, 387 F. Supp. 2d 329, 333 (S.D.N.Y. 2005) ("the existence of explicit contractual rights makes a breach of contract claim qualitatively different from a claim for copyright infringement."); *BanxCorp. v. Costco Wholesale Corp.*, 723 F. Supp. 2d 596 (S.D.N.Y. 2010) ("the extra element that saves a contract claim from preemption is the promise itself"); *Logicom Inclusive, Inc. v. W.P. Stewart & Co.*, No. 04 Civ. 0604 (CSH); 2004 WL 1781009, at *18 (S.D.N.Y. Aug. 10, 2004) (citation omitted) ("state law claims for breach of contract are generally not preempted by the Copyright Act . . . . [w]hile a copyright is a right against the world, contracts generally only affect their parties, and so do no create "exclusive rights") (citation omitted); *see also Utopia Provider Sys., Inc. v. Pro–Med Clinical Sys., L.L.C.,* 596 F.3d 1313, 1327 & n. 26 (11th Cir. 2010) (holding that "a valid license agreement ... constitutes an 'extra element'" because plaintiff must prove a valid license).

Other courts examine the contractual promise itself to determine whether it is qualitatively different – here, whether the contract right in question is equivalent to any of the exclusive copyright rights.  Specifically, where an alleged breach of contract is based on more than just unauthorized use of a copyrightable work, there is no preemption.  *See Bill Diodato Photography, LLC v. Avon Prods., Inc.*, No. 12 Civ. 847(RSW), 2012 WL 4335164, at *7 (S.D.N.Y. Sept. 10, 2012) (Defendants' use of images beyond the one-year licensing term without negotiating a fee to be paid "'provides the extra element necessary to make a breach of contract claim qualitatively different from a copyright infringement claim,' as Plaintiff bears the burden of proving not just that Plaintiff used the images beyond the one-year licensing agreement, but also that Defendant failed to negotiate a fee") (quoting *Canal Image UK v. Luvtak*, 773 F. Supp. 2d 419, 443 (S.D.N.Y. 2011)); *Lennon v. Seaman*, 63 F. Supp. 2d 428 (S.D.N.Y. 1999) (finding no preemption where contract imposed restrictions on distribution of copyrighted material through confidentiality

provision); *Stadt v. Fox News Network LLC*, 719 F. Supp. 2d 312 (2010) (no preemption where Complaint alleged defendant breached a license where it continued to list and claim exclusive credit for Plaintiff's video after termination of the license); *National Car Rental Sys., Inc. v. Computer Assocs. Int'l, Inc.,* 991 F.2d 426, 431 (8th Cir. 1993) ("We conclude that the alleged contractual restriction on [defendant's] use of the [copyrighted property] constitutes an extra element...."); *Taquino v. Teledyne Monarch Rubber,* 893 F.2d 1488, 1501 (5th Cir. 1990) ("This action for breach of contract involves an element in addition to mere reproduction, distribution or display: the contract promise ..., therefore, it is not preempted.") (citation omitted).

Under either analytical framework for evaluating the preemption of breach of contract claims, Genius's claims satisfy the extra element standard and should not be preempted.  If the Court follows *Architectonics*, the mere existence of the Terms of Service which prevents Defendants from engaging in the misconduct identified above, and by which Defendants are bound, avoids preemption.  *See Lennon*, 63 F. Supp. 2d at 438 (*Architectonics* "stand[s] for the broad proposition that it is the promise inherent in contract arrangements that is the "extra element" that saves contract claims from preemption.").

However, even if this Court is to examine the contractual right at issue in making its determination, there is no equivalency between Genius's contract claims and a copyright claim. Specifically, Genius's Terms of Service explicitly restrict use of its content for "direct commercial endeavors" or "commercial purposes" without the express written consent of Genius. Thus, in order to prove its Contract claims, Genius not only needs to prove that Defendants scraped content from its website, but also that Defendants used it for "commercial endeavors."  This "extra element" makes Genius's breach of contract claims qualitatively different from its copyright claim and preemption should be denied.  *See National Car Rental Sys., Inc.*, 991 F.2d at 431 (no

preemption where contract restricted use of copyrighted material); *Lennon*, 63 F. Supp. 2d 428 (no preemption where contract imposed restrictions on distribution of copyrighted material through confidentiality provision). Indeed, Google and LyricFind themselves deem it necessary to contract with each other for these very rights – thus, they cannot credibly argue that there are no rights at issue beyond the copyrights in the lyrics.

**B. Genius's Unjust Enrichment Claims Are Not Preempted By The Copyright Act**

Genius's claims for unjust enrichment are qualitatively different than a copyright infringement claim. Specifically, as set forth in the Complaint, Genius alleges Defendants' deceptive and wrongful conduct in unjustly enriching themselves through their improper exploitation of the fruits of Genius's substantial labor and investment, content from Genius's Service and subsequent concealment. Applying Second Circuit precedent concerning copyright preemption, the court in *CVD Equip. Corp. v. Precision Flow Tech., Inc.* agreed that pleading deception was sufficient to avoid preemption, holding, in the context of an unjust enrichment claim:

> the background recitations in the amended complaint alleged that defendants have misappropriated the fruit of [plaintiff's predecessor-in-interest's] labors and expenditures by obtaining access to the materials in at issue through fraud, deception or abuse of fiduciary relationships. The extra element of inequity through fraud, deception, or abuse of fiduciary relationships is sufficient to change the nature of the unjust enrichment claim so that it is qualitatively different from a copyright infringement claim.

No. 1:02-CV-651(NAM), 2007 WL 951567, at *2 (N.D.N.Y. Mar. 27, 2007) (citing *Kregos v. Associated Press*, 3 F.3d 656, 666 (2d. Cir. 1993); *Computer Assocs.,* 982 F.2d at 716).

Here, the Complaint details the deceptive conduct undertaken by Defendants in connection with their misappropriation of the fruits of Genius's substantial labor and investment, content from Genius's Service, including the removal of known watermarks from content, an unfulfilled pledge

to "investigate," and the continued, public and false denial of any sourcing of the content from Genius's website.  There is thus no basis to conclude that the Copyright Act preempts Genius's claims of unjust enrichment.

## II.   THE COPYRIGHT ACT DOES NOT PREEMPT GENIUS'S UNFAIR COMPETITION CLAIMS

LyricFind and Google erroneously claim that federal copyright law preempts Genius's unfair competition claims (Counts V through VIII), which concern LyricFind and Google's bad faith and deceptive misappropriation and commercialization of that content to the detriment of Genius.  However, as alleged in Genius's complaint, unfair competition claims under New York and California include an "extra element" of "bad faith" and "unfairness," which makes such claims qualitatively different from a copyright claim, thereby defeating preemption.

Where, as here, New York unfair competition claims are based on misappropriation, plaintiff must show that defendant misappropriated plaintiff's labor, skills, expenditures or good will and displayed some element of **bad faith** in doing so.  *Shroeder v. Pinterest, Inc.*, 133 A.D.3d 12, 30 (1st Dep't 2015).  In this context, bad faith is established by a showing of dishonest conduct, fraud, deception or an abuse of a fiduciary or confidential relationship. *Id. See also Telecom Inter. Am. Ltd. v. AT&T Corp.*, 280 F.3d 175, 197 (2d Cir. 2001)  ("The essence of an unfair competition claim under New York law is that the defendant misappropriated the fruit of plaintiff's labors and expenditures by obtaining access to plaintiff's business idea either through fraud or deception, or an abuse of a fiduciary or confidential relationship.") (citation omitted); *Big Vision Private Ltd. v. E.I. DuPont De Nemours & Co.*, 1 F. Supp. 3d 224, 275 (S.D.N.Y. 2014), *aff'd,* 610 F. App'x 69 (2d Cir. 2015) ("Bad faith is an essential element of an unfair competition claim.  Mere negligence or recklessness is insufficient to sustain this claim; instead, a plaintiff must establish bad faith by showing that the defendant acted out of a dishonest purpose").

Similarly, Genius's unfair competition claim against Defendants under Section 17200 requires proof of additional elements not found in the Copyright Act.  Specifically, to prove Google and LyricFind engaged in "unfair" business practices, Genius is required to show that Defendants engaged in a business practice that is "immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers."  *Candelore v. Tinder, Inc.*, 19 Cal. App. 5th 1138, 1155 (2018) (citation omitted); *see also Majd v. Bank of Am., N.A.*, 243 Cal. App. 4th 1293 (2016); *People v. Duzmor Diagnostic Lab., Inc.*, 68 Cal. App. 4th 654, 662 (1998).  No such intent is required by the Copyright Act.

These extra elements of "bad faith" and "unfairness" make the unfair competition claims qualitatively different than a copyright claim, thereby defeating preemption.  *See SCO Grp., Inc. v. IBM Corp.*, 879 F.3d 1062 1080-81 (10th Cir. 2018).  The Tenth Circuit (applying New York law) has addressed this very issue.  In *SCO Group*, the court found Plaintiff's New York unfair competition claim was not preempted by the Copyright Act because the "bad faith" required for an unfair competition claim makes it qualitatively different than a copyright claim, where intent is not a required element.   Specifically, the *SCO Group* Court stated:

> In this context, 'bad faith' is not simply a scienter requirement . . . . [r]ather bad faith in the context of an independent New York unfair competition claim typically results from fraud, deception, or an abuse of fiduciary or confidential relationship . . . and it forms the basis for a state-law claim whether or not [defendant's] use of the SVr4 code violated federal copyright law . . . . [b]y contrast, federal copyright infringement does not require proof of unfair competition as that term has been defined under New York law. A plaintiff seeking relief for federal copyright infringement must prove only that he 'owns a valid copyright' and that the defendant 'copied protectable elements of the copyrighted work.' Because misappropriation under New York law is an independent claim with a separate element of bad faith business dealings, plaintiff's claim is not 'equivalent' to a federal copyright infringement claim. Accordingly, it is not preempted…

879 F.3d at 1080-81 (internal citations omitted); *see also Silverstein v. Penguin Putnam, Inc.*, No. 01 Civ. 309(JFK), 2003 WL 1797848, at *8 (S.D.N.Y. Apr. 4, 2003) (finding unfair competition claims not preempted because it involved the extra element of "misrepresentation or deception.").

This analysis likewise applies to Genius's unfair competition claim under Section 17200, which requires an extra element of unfairness, or a business practice that is "immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers." *Candelore*, 19 Cal. App. 5th at 1155. Again, this required element is one that does not exist in copyright infringement.

Not only are Genius's unfair competition claims not preempted as a matter of law, but the well-pled allegations in the Complaint demonstrate how Defendants' deceptive, unethical and immoral conduct is substantively different than a copyright claim. Specifically, after publication of the *Wall Street Journal* article, Genius's Watermark #1 disappeared from Google's lyrics Information Box, suggesting to Genius that a deliberate effort was made to conceal the misappropriation. (Compl. ¶¶ 82-83.) Genius suspected that the misappropriation was continuing unabated and devised Watermark #2 to test its suspicion. Genius then applied the watermarks to three sample groups of lyrics on Genius's website as follows: (1) Watermark #1 only ("Group A"); (2) Watermark #2 only ("Group B"); and (3) Watermark #1 and Watermark #2 ("Group C"). (*Id.* ¶ 85-86.) Genius regularly monitored the Google lyrics Information Boxes in all three groups. While Genius did not observe Watermark #1 on any content in Google's lyrics Information boxes, it did observe the Watermark #2 on content in both Groups B and C. (*Id.* ¶ 87.) Notably, with respect to the lyrics in Group C – which featured both Watermark #1 and Watermark #2 – Genius identified numerous instances in which Defendants removed the publicly-known Watermark #1, while retaining the second, previously non-public Watermark #2. (*Id.* ¶ 88.) There can be no clearer allegations of Defendants' deceptive, immoral and unscrupulous conduct than in

concealing its misappropriation of lyrics from Genius's website.   In response to the public airing of Genius's allegations, even Google itself acknowledged that the allegation of the misappropriation of lyrics merited an investigation.

Moreover, despite actual knowledge of the misappropriation of content from Genius's website, Google continues to identify such content as "Source: LyricFind" in its Information Boxes, which is affirmatively misleading and dishonest.   To further damage Genius, the display of the Information Box by Google in its search results crowds out organic search results from the first page display – which, in many cases, causes the link to Genius's website (often the #1 organic search result for lyrics) to disappear from users' immediate view.   The direct result of this display and placement is to divert traffic from Genius (and therefore deprive Genius of revenue) in order to retain users within Google's ecosystem for Google's own pecuniary benefit.   The diversion of traffic and revenue from Genius directly harms consumers by impairing Genius's ability to produce the timely and accurate lyrics transcriptions that the market demands.

As demonstrated above, the extra elements of bad faith and unfairness in the unfair competition claims defeat Defendants' claim of copyright preemption.   New York and California unfair competition laws do not impose liability for mere copying of content from another's website, and Genius's unfair competition claims are not based on mere copying of content from its service.   Rather, Genius's unfair competition claims are based on Google and LyricFind's misappropriation of content from Genius's Service through the deceptive, immoral and dishonest practices identified above that cause injury to consumers.   Because Genius's unfair competition claims focus on Defendants' deceptive and unscrupulous conduct, they are not preempted by federal law.

**CONCLUSION**

For the foregoing reasons, Genius respectfully requests that this Court enter an order granting the Motion and remanding this action to the Supreme Court of the State of New York, County of Kings.

Dated: New York, New York
        February 6, 2020

Respectfully submitted,

PRYOR CASHMAN LLP

By:     Ilene S. Farkas
        Marion R. Harris
        Kaveri Arora
7 Times Square
New York, New York 10036
Tel: (212) 421-4100
Fax: (212) 326-0806
ifarkas@pryorcashman.com
mharris@pryorcashman.com
karora@pryorcashman.com

*Counsel for Plaintiff*